# UNITED STATES DISTRICT COURT

__NORTHERN__ DISTRICT OF __ILLINOIS, EASTERN DIVISION__

UNITED STATES OF AMERICA

v.

JEROME WARE

**MAGISTRATE JUDGE MASON**

CRIMINAL COMPLAINT

CASE NUMBER: 08CR 0041

FILED
KC JAN 1 7 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

I, HOLLY BARRILE, being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about __September 29, 2006__ in __Cook__ county, in the __Northern__ District of __Illinois__ defendant(s) did,

knowingly and intentionally distribute a controlled substance, namely, 500 grams or more of a mixture and substance containing cocaine, a Schedule II Narcotic Drug Controlled Substance,

in violation of Title __21__ United States Code, Section(s) __841(a)(1)__.

I further state that I am a(n) Special Agent with the Federal Bureau of Investigation and that this complaint is based on the following facts:

See attached affidavit.

Continued on the attached sheet and made a part hereof: __X__ Yes ___ No

_Holly Barrile_
Signature of Complainant

Sworn to before me and subscribed in my presence,

__January 17, 2008__ at __Chicago, Illinois__
Date                                    City and State

_Michael T. Mason_
Signature of Judicial Officer

MICHAEL T. MASON, U.S. MAGISTRATE JUDGE
Name & Title of Judicial Officer

State of Illinois        )
                         ) SS
County of Cook           )

## AFFIDAVIT

I, Holly Barrile, being first duly sworn on oath, depose and state as follows:

### Background of Affiant

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been so employed since 1996. In connection with my FBI duties, I investigate criminal violations of the federal narcotic laws, including but not limited to 21 U.S.C. §§ 841, 843, and 846. I also have received specialized training in the enforcement of laws concerning the activities of narcotic traffickers.

2. The information set forth in this Affidavit is based on my own participation in this investigation, my review of documents and reports related to this investigation, my review of audio and video recordings made during this investigation, information conveyed to me by other local, state, and federal law enforcement officers, and information provided by cooperating witnesses. Because this Affidavit is made for the limited purpose of establishing probable cause in support of the attached criminal complaint against JEROME WARE, also known as "G-ROME" ("WARE"), it does not contain everything that I or other law enforcement officers know about WARE or the events described herein.

### Information Provided by a Cooperating Witness

3. Some of the information contained in this Affidavit has been provided by a cooperating witness ("CW"). CW has assisted the FBI in ongoing criminal investigations and has

1

cooperated for money and been reimbursed for expenses. Information provided by CW has resulted in 10 arrests and the seizure of narcotics valued at over $270,000, including cocaine, heroin, and marijuana, and therefore the CW has proven reliable. The CW has a previous felony conviction for robbery. CW is an admitted high-ranking member of the Black P-Stone Nation street gang ("BPSN"). CW has identified WARE as a high-ranking BPSN members responsible for drug distribution and gang activity in an area on the South Side of Chicago controlled by the BPSN.

4. The information provided by CW in this Affidavit has been corroborated by law enforcement officers whenever possible by, among other things, the use of electronic recording devices and physical surveillance. I have included my understanding of some of the words and phrases used in the recorded conversations set forth in the Affidavit. My understanding is based on the content and context of the conversations, information provided by the CW who participated in the recorded conversation, my training and experience, and the experience of other law enforcement officers.

5. On or about July 25, 2006, CW was introduced to WARE by Individual A, an admitted BPSN General. Individual A identified WARE as one of his sources of supply. This meeting between Individual A, CW and WARE was not recorded or overheard by law enforcement officers. According to CW, during the meeting, CW told WARE that he/she would contact him at a later date to arrange the purchase of a kilogram of cocaine. WARE told CW that he could probably provide the cocaine for $19,500 a kilogram.

6. On September 14, 2006, at approximately 8:44 p.m., at the direction and in the presence of agents, CW made a consensually-recorded call to WARE at (312) 563-6340. During that call, WARE asked CW if CW remembered "the original conversation." Per the CW, the CW and

WARE were originally introduced so the CW could purchase kilogram quantities of cocaine from WARE. The CW responded, "Yeah" and WARE asked "When, Uh, you gonna be back around." (WARE was asking if the CW was ready to purchase.) The CW responded, "Shit, you know, I'm uh, I'm stored up shit, it'll probably be uh, probably another week or two." The CW advised that he/she stalled for time by saying it would be a week or two in order to allow time for agents to plan the purchase.

7. On September 25, 2006, at approximately 5:23 p.m., CW placed another consensually-recorded call to WARE. During this recorded call, CW told WARE, "I'm ready for you this week for sure man." WARE responded, "OK, I was just checking with ya."

### The September 29, 2006 Drug Transaction

8. On September 29, 2006, at approximately 8:51 a.m., CW placed another consensually-recorded call to WARE. During that recorded call, CW and WARE arranged to meet at CW's residence to conduct a drug transaction for 1 kilogram of cocaine.

9. Prior to the meeting, CW was fitted with an audio and video recording device and the CW and his/her vehicle were searched by agents for weapons, contraband, drugs and excessive money; none was found. CW also was given $20,000 in pre-recorded government funds for the purchase of 1 kilogram of cocaine from WARE, and $1250 to pay Individual A for setting up the deal.

10. On September 29, 2006, at approximately 10:37 a.m., with surveillance agents watching, WARE met the CW at CW's residence. Agents observed WARE park on the street in a white Cadillac SUV, registered to WARE, near the CW's residence. The CW and WARE entered the residence. WARE remained in the front room while the CW walked into a back room, placed

the money in a plastic bag to make it appear that the money was inside the residence, and walked with the money back to the front room. The CW counted $20,000 in front of WARE and then handed the money to WARE. While the CW was counting the money, WARE told CW that he wanted to develop a relationship with CW in which the CW's "money would be no good," meaning WARE would provide kilograms of cocaine to the CW on credit.

11. After counting the money, CW and WARE left the residence. The CW and WARE proceeded to WARE's vehicle, the white Cadillac SUV, and got inside of it. WARE then drove the CW around to the rear of CW's residence in the alley. This meeting was also audio and video recorded. At that location, WARE told CW to watch his back while WARE opened the hood of the Cadillac SUV, reached into the engine compartment, and pulled out a black bag. WARE instructed CW to take out what was inside the bag. CW retrieved a tan plastic bag out of the black bag. WARE told the CW, "It's smashed a little bit, but it's all there." WARE and CW then walked to the backyard of the residence, where CW removed a clear plastic bag from the tan plastic bag. The clear bag contained a white, powdery substance. WARE told the CW, "I did the open box...next time you can get it in the mummy or any way you want it." The CW explained to agents that WARE was referring to the packaging of the suspected cocaine, which was a clear plastic "ziplock" style bag, normally kilograms are wrapped and taped tightly. WARE told the CW to call him and then departed the backyard of the residence.

12. After agents observed WARE leaving, CW walked to the rear exterior basement door of the residence. CW then walked out the rear basement exterior door of the residence and proceeded to the front of the house, where agents observed him/her walk to his/her vehicle carrying the kilogram of suspected cocaine. The CW entered his/her vehicle with the suspected cocaine and

proceeded to a predetermined location to meet with agents. Agents followed the CW to the predetermined location where the CW turned over the plastic bag containing the suspected cocaine. A search of the CW and his/her vehicle was conducted by law enforcement officers; the search uncovered no contraband, drugs, weapons or excessive funds, other than the cocaine CW received from WARE and $1,250 which was used later to pay Individual A for setting up the deal.

13. The substance from inside the plastic bag field-tested positive for cocaine. The substance was subsequently tested by the DEA laboratory, which concluded that the substance was 1,003 grams of cocaine.

14. I believe that the substance purchased from WARE was cocaine based on, among other things: (1) my experience as a law enforcement officer; (2) a visual inspection of the white, powdery substance; and (3) a positive field test for the presence of cocaine.

15. Based on the foregoing, I respectfully submit that there exists probable cause to believe that JEROME WARE knowingly and intentionally distributed a controlled substance, namely 500 grams or more of a mixture and substance containing cocaine, in violation of Title 21, United States Code, Section 841(a)(1).

_____
HOLLY BARRILE
SPECIAL AGENT, FEDERAL BUREAU
OF INVESTIGATION

Sworn to and subscribed to before me on
this 17th day of January 2008.

_____
MICHAEL T. MASON
UNITED STATES MAGISTRATE JUDGE